## E. BRUNET *v.* THE STATE.

1. EVIDENCE.— The defense in a murder case having proved that the deceased was a man of violent and dangerous character, and the State having adduced contrary evidence, the defense were entitled to introduce the records of another court to show that the deceased had, at one time, been convicted of manslaughter.

2. SAME — CASE STATED.— In a murder trial wherein there was no eyewitness to the homicide, the defense offered to prove, on the cross-examination of a State's witness, that, within five or ten minutes after the last shot was fired, the witness went to the defendant's ice factory, and there found the defendant, who said: "I am sorry I was compelled to do what I have done. I was sleeping in the factory when I heard the noise of breaking dishes in the house. I got up and went towards my house and heard Burns (the deceased) say he would kill me, and he was coming towards me with what I thought was a gun in his hands, and saying: 'I will kill him, the d—d son of a b—h,' and I fired on him twice. I do not know whether I have killed him or not. I will go down to McDonald's with you and then go to Belton and surrender myself to the sheriff;'" which he did. *Held*, admissible as part of the *res gestæ*.

3. MANSLAUGHTER.— CHARGE OF THE COURT in this case should have included the law of manslaughter, first, because it was necessary to complete the definition of murder in the second degree, and second, because there was evidence tending to present that issue.

4. PRIVILEGE OF COUNSEL — PRACTICE.— An attorney appointed by the court to assist the prosecuting attorney stated in his argument that he appeared not as hired counsel but upon the suggestion of the court, the county attorney being worn out. *Held*, that such remarks were calculated to impress the jury with the belief that the presiding judge believed the defendant guilty and desired his conviction; and it was the duty of the court to stop the counsel and instruct the jury that such was not the purpose of the appointment.

Appeal from the District Court of Bell.   Tried below before the Hon. B. W. Rimes.

The indictment charged the murder of James Burns, in Bell county, Texas, on the 24th day of March, 1882. The verdict returned by the jury was one of conviction of murder in the second degree, and the punishment awarded was a five years' term in the State penitentiary.

W. S. Blanton, sheriff of Bell county, testified for the State that the defendant came to him in Belton and surrendered himself, informing the witness that he had gone to bed that night in his ice factory, and that while lying in bed he heard an unusual noise or racket in his house near by, and ran up there; that he saw Burns, the deceased, coming towards him with what he took to be a gun, and that he had fired on him twice and had probably killed him.

Annie Hirshfield testified for the State that she and the deceased moved to the defendant's place on the Leon river, about one mile east of Belton, about nine or ten months before the homicide.   The premises were known as the "Ice Factory," and consisted of an ice manufacturing establishment and a dwelling house, with a stable situated between them.   The dwelling was situated some 75 or 100 yards distant, up the river from the ice factory. The witness gave a detailed description of the construction of the dwelling house.

The understanding upon which the deceased and the witness went to live at the defendant's house was that the defendant should furnish the house, furniture, food, etc.; the witness was to do the cooking, washing, housekeeping, etc., and the deceased was to live there and to be given employment whenever the defendant should have any work to be done.   The defendant had employed the deceased most of the time while the ice machine was running.   On March 24, 1882, the day of the killing, the

defendant and the deceased went to town as usual in the ice-wagon. This was in the afternoon. About 9 o'clock at night, the defendant and the deceased not having returned, and the witness being alone, she grew uneasy and went down to the wagon-gate near the factory, to wait for them. After waiting some time the defendant drove up in the wagon alone, and while ungearing his horse from the wagon told the witness that he and the deceased had had a difficulty in town, and that he had put the deceased out of the wagon; that he would not stay at the house that night, and directed the witness to tell the deceased when he got home that he, the deceased, and the witness must leave the place on the morrow; that he would have nothing more to do with the deceased and did not want to see him again.

The witness returned to the house, and, after the lapse of about an hour, the deceased came in very much under the influence of liquor. He asked the witness if she had his supper for him, and she spread it on the table in the dining room, about three or four feet from the door connecting with the kitchen. The deceased sat down to eat, and began telling the witness about the difficulty in town between him and the defendant. Suddenly he caught up the carving-knife from the table, got up and kicked the table, nearly overturning it. The dishes fell off on the floor with a loud crash, many of them breaking. The lamp turned over, spilling the oil, and the house was subjected to much danger of fire from the oil running on the floor. The deceased was cursing and swearing and saying that he would kill him (meaning the defendant). The deceased advanced towards the door connecting the dining room and the kitchen. The witness stooped down to blow out the lamp, her back being towards the deceased. It was dark in the house at this moment, and a shot was fired. The deceased then went out of the dining room into the sleeping room, and thence out through the

gallery into the yard. The defendant at this juncture came into the dining room from the kitchen, and asked the witness: "Where is Burns?" to which the witness answered that she did not know. The defendant then went out of the house, and deceased came back into the house, and asked the witness: "Where is that shotgun?" and the witness answered that she did not know.

The deceased went out of the house, and presently came back with a pitch-fork in his hand, and said to the witness: "I'll kill that d—d French son of a b—h," at the same time holding the pitch-fork presented like a gun when in the act of shooting, the prongs of the pitch-fork being from him and the handle held toward him. He stood in the kitchen door leading towards the factory, and asked the witness to make him a cigarette. The witness went into the sleeping room to make it, leaving the deceased standing in the kitchen door with the pitch-fork, cursing the defendant and saying he would "kill the d—d French son of a b—h." At this time she heard another shot fired, and, being frightened, she did not go out of the sleeping room for the space of five minutes. When, at the expiration of about five minutes, she did go out, passing through the dining room and kitchen, she found the deceased near the corner of the kitchen, lying on his face on the ground, his head towards the main house, and his feet towards the corner of the kitchen.

The witness, seeing that the deceased appeared to be dead, started to go to the house of J. M. McDonald, the bridge-keeper, which was down the river and beyond the ice factory, about 300 yards distant. As the witness passed the factory, on the direct route to McDonald's, she saw the defendant standing in the ice factory. He came out and walked with her to McDonald's, where the witness stayed until morning, and the defendant left the witness to go to town, as she understood.

On cross-examination the witness stated that the carv-

ing knife which the deceased took up from the table was a good sized carving knife, with about eight inches of blade and a light-colored handle; that the double-barreled shot-gun always stood in the corner of the kitchen between the two doors, the one leading to the dining room and the other to the ice factory, and the shot and powder were always kept on a small shelf just above the gun. The distance between the two doors was not more than three or four feet, almost in a step of each other. The defendant owned the gun.

The witness was very much frightened after the last shot, and could not say exactly what length of time had elapsed from the last shot until she encountered the defendant at the ice factory, but not exceeding five or ten minutes, possibly not so long as ten minutes. When the defendant met the witness he stated to her how the shooting happened and his reason for doing it, and talked to the witness about it on the way to McDonald's. When she arrived at McDonald's the witness repeated to him the defendant's statement of the shooting. The witness had not lived at the defendant's place since the killing, but had rented a house and lived in town.

Two or three weeks before the killing the witness and the deceased were sitting in the kitchen door, talking. The deceased was somewhat in liquor, was in a bad humor, and was talking of the defendant, and said, among other things: "I will kill that d—d French son of a b—h yet, if he fools with me," or words to that effect. A day or two afterwards the defendant told the witness of this conversation, and what the deceased had said, and repeated to her the language of the threat. The witness did not see either the defendant or the deceased, nor any other person, at the very moment the shots were fired, and does not know who fired the shots. She had relighted the lamp after the first shot. The deceased said nothing just after the first shot was fired, and did not

appear to be wounded. A ball fired by one standing just inside of the kitchen with a gun or pistol pointed towards the dining room door, could have passed out through the west window of the dining room on the gallery.

The witness further testified, on her cross-examination, that she, the deceased and the defendant usually slept at the house where the killing took place, and in which there were two beds and a pallet. The deceased and the witness were never married, but they had lived together in Brenham, and when the deceased moved to Belton the witness came to him and for awhile they lived at the Avenue Hotel, but for eight or ten months preceding the killing they had lived together at the house of the defendant. She did not know the defendant before she moved to his house with the deceased. The land, the house, the ice factory, furniture, dishes and all the property on the premises belonged to the defendant. The defendant had always treated her and the deceased well, and the defendant and the deceased always got along well, except when the latter was drinking, and he often drank to excess; at which times he was desperate and dangerous. The defendant had often expressed to the witness his fears that the deceased would maltreat him at some time when intoxicated.

Joe Lambert, for the defense, testified that he had been acquainted with the deceased for about two years, part of that time in Brenham, Texas, and had known the defendant for more than a year. On the night of the killing the deceased came into the Chrystal saloon, where the witness kept bar, and called for a drink. The witness told him not to drink any more, that the " old man," meaning defendant, would not like it; whereupon the deceased cursed the defendant and the witness, and said that he would " kill that G—d d—d French son of a b—h before morning." The deceased then turned and went off, and the witness saw no more of him. A half hour

later the defendant came in, and the witness told him what the deceased had just said, and told him to be on his guard, that the deceased was a desperate man when drinking, and advised the defendant not to allow the deceased any advantage. The witness stated that the deceased was a dangerous and desperate man, especially when drinking.

Joe Miller testified for the defense that he was a farmer and lived four miles east of Belton, and had known both the deceased and the defendant for several years. A few days before the killing the defendant asked the witness to send some hands to his place to plant corn for him; which the witness agreed to do. On the Saturday before the killing, the witness with two hands and two teams went to the defendant's place, but found no man about the place. He went on to town in quest of the defendant, to get him to furnish a hand to drop the corn. Failing to find him, he returned to the defendant's place and learned that the defendant and deceased had returned in the meantime. He found the deceased in the ice factory and asked him what he was doing. The deceased broke out in a tirade against the defendant, cursed him, and said, among other things, "I will kill that d—d son of a b—h yet." The witness went on to where the corn was being planted, and there found the defendant dropping the corn. The witness asked the defendant what was the matter between him and the deceased, and he answered that the deceased was dropping the corn too thick. The witness then told the defendant of the threat of the deceased, and cautioned him against him, telling him that he regarded the deceased as a very dangerous man. The witness further testified that the general reputation of the deceased was that of a dangerous, desperate man, especially when drinking, and one likely to carry a threat into execution; and that the defendant had the general reputation of being a quiet, peaceable, inoffensive man.

J. M. McDonald testified for the defense that he was
the bridge-keeper at the Leon wagon bridge. He testified
to the location of the ice factory, the defendant's house,
stable, and the bridge-keeper's house, etc., and the dis-
tances between them substantially as detailed by the wit-
ness Annie Hirshfield. The witness with his family was
at home, at the bridge, on the night of the killing. The
witness heard the two shots, which were fired very close
together, not over the half of a minute intervening. A
very short time after the shots, the defendant and Annie
Hirshfield came to the witness's house, together. The de-
fendant remained but a few moments and went on
towards Belton, and Annie Hirshfield stayed all night.
Soon after reaching the house that night, Annie Hirsh-
field told the witness all about the killing, and also gave
the witness an account of what was detailed to her by
the defendant. The defendant had the reputation of
being a quiet, peaceable, law-abiding man.

Henry Holzclaw testified for the defense that he knew
the defendant. On the evening of the killing, as he was
going home to supper, traveling the road leading from
town to the ice factory, at a point near the female acad-
emy, about a quarter of a mile from the business part of
town, he saw the ice wagon in which the defendant
usually came to town. The horse was backing so as to
throw the wagon across the street, and the defendant,
who was in the wagon, was crying "help! help! help!"
Col. J. Z. Miller, who was near the witness, proposed
that he and witness go to the assistance of the defend-
ant. Col. Miller reached the wagon before the witness
did, and, as the latter approached, the defendant scram-
bled out of the wagon over the horse's back, got to the
horse's head and caught the bridle. When the witness
reached him the defendant was talking to some one in
the wagon, saying: "Get out of there, intruder! Get
out of there, you d—d son of a b—h! Get out of there,

you d—d son of a gun!" The defendant also placed his right hand on his left arm near the elbow, as if showing the place, and said, "he bit me on my arm." The man in the wagon finally got out, and then the defendant got into the wagon, turned around and drove off towards town, leaving the man standing in the road. After the man got out of the wagon he stood very near the defendant and the witness, and appeared very angry, staring at the defendant with his arms folded; but he said nothing. As the defendant drove off he said to Col. Miller and the witness: "Gentlemen, take notice; I will have this man put in jail, and I want you as witnesses in the morning." After the defendant had driven off, the man turned to Col. Miller and the witness, and said: "Yes! gentlemen, take notice; I, too, will want you as witnesses." The witness did not remember to have seen the man before. He was about five feet, eight or ten inches in height, dark hair and eyes, was heavy built, weighing about 175 pounds. He wore no coat.

The witness, having got his supper, started back to town and encountered the man *en route.* He walked to town with the witness. He was very much in liquor, but entirely at himself. He talked with the witness about the difficulty, and said that he did not know whether or not he would go to the defendant's that night; that he would take his wife away from the defendant's house next day; that she had been cleaning up the defendant's "slops" long enough.

Col. J. Z. Miller was the next witness for the defense. There was no manner of variance between his testimony and that of the witness Holzclaw, up to the latter's statement that the deceased got out of the wagon and the defendant drove off; after which time the witness Miller saw no more of the deceased.

Green Pope testified for the defense that he lived on the road between Belton and the ice factory, and about a

quarter of a mile distant from the latter. The witness
was familiar with, and described the construction of the
defendant's house. He testified that he was at the house
on the afternoon of the day after the killing, and saw a
bullet hole through the window opening from the dining
room to the gallery. The bullet hole was too high to
have been made by a shot from a man standing on the
gallery, so as to strike in the side with the bullet a man
standing in the dining room. Small particles of glass
had fallen to the gallery on the outside of the window.
From these facts the witness was of the opinion that the
shot which made the hole in the window was fired from
the inside, on the dining room side of the window. The
witness was at the house of the defendant a day or two
before the killing of the deceased, and then saw no hole
in the window. The general reputation of the defendant
was that of a quiet, peaceable citizen. The witness was
not acquainted with the reputation of the deceased.

Jeremiah Scott testified for the defense that he was
one of the jury of inquest which sat on the body of the
deceased. He described the location of the premises as
described by the witnesses Annie Hirshfield and Mc-
Donald, and the position of the body as described by
Annie Hirshfield, except that when he saw it the head
was pillowed on a block and sack. The feet were straight-
ened out, and one hand was lying by the side and the
other on the breast. The witness found on the east side
of the kitchen a three-pronged pitchfork. The prongs
were of iron, sharp, and twelve or fourteen inches long.
The wooden handle was about eight feet long. The prongs
were pointing towards the body of the deceased and the
ice factory, and the handle was pointing a little to the
east of north. There were spots of blood on the ground,
beginning at a point about opposite the middle of the
handle of the pitchfork, and continuing around the
corner of the kitchen to the doorstep near which the body

lay.   The witness also found a fresh made cigarette,
which had never been lit, lying on the sill of the north
window   in   the   kitchen,   and   opposite   the   entrance
door of the kitchen near where the dead body lay.   The
witness found the   dishes on the floor in the dining
room, broken and in confusion, and the lamp was turned
over, and the oil was all over the floor.   The shot and
powder were lying at the northeast corner of the kitchen,
just beyond or north of where the pitchfork was found.
There were two wounds on the body of the deceased; one
a flesh-wound on the right side above the waist, just pass-
ing into the flesh and coming out; the other in the central
part of the chest, coming out at the shoulder on the back.
The witness described the deceased and his appearance
substantially as they were described by the witnesses
Holzclaw and Miller.   The general reputation of the
deceased was that of a desperate, dangerous, bad man,
and that of the defendant was that of a quiet, peaceable
and inoffensive man.

Collins and Embree testified that the general reputation
of the defendant was that of a quiet, peaceable man.

Dan Sargeant and John McKnight, having qualified
themselves under the statute, testified that the general
reputation of the deceased was that of a desperate man,
especially when drinking.   The witness McKnight stated,
on cross-examination, that he had heard Lyendecker,
Dan Sargeant and others speak of the reputation of the
deceased.   Lyendecker, Sargeant and the others referred
to had lived in Belton for about one year.   The witness
did not know what business they followed, but had heard
that they and the deceased were "sports."

In rebuttal, R. B. Hunt and D. Allen testified for the
State that the general reputation of the deceased, so far
as they knew, was that of a quiet, peaceable man, but
neither had ever heard it discussed.   The witness Hunt
had been a deputy marshal of Belton for more than a

year, and Allen had been an alderman in Brenham, where the deceased lived before moving to Belton.

H. E. Otto testified that he knew the deceased for some time before he left Brenham, and had known him ever since he lived in Belton. His reputation was that of a harmless man.

The facts immediately relevant to the rulings appear in the opinion and the head-notes.

*Boyd & Holman*, and *Hancock & West*, filed an able and elaborate brief for the appellant, but too lengthy for insertion.

*H. M. Holmes*, for the State.

HURT, J.   The appellant was convicted of murder of the second degree; his punishment being assessed at confinement in the penitentiary for the term of five years.

There was no person who saw the parties at the time of the shooting. This fact is very important, and should be kept in mind all the while. (The evidence will be given by the Reporters.) The defendant proved, and the State of course made it proper for him to do so, that the deceased was a malicious and dangerous man. The State adduced evidence to the contrary; hence a conflict. The defendant then proposed to introduce in evidence the record of conviction of the deceased for manslaughter. This was objected to by the State, and the court sustained the objection. The question is presented,— was this record competent or admissible evidence ? We think so.

The objection to the introduction of particular acts is the want of information and preparation to meet them by the party; either the witness or the party interested in his testimony. This objection not being applicable in this state of case, the rule does not apply, for no amount of time and preparation would enable the witness or the State to meet and overturn the solemn judgment of a

court of competent jurisdiction. At the trial in which he was convicted, the exact nature of the charge was furnished him, and opportunity was given him to prepare and meet the same; in a word, there was no surprise at that trial.

It appears by bill of exceptions that the defendant offered to prove by one Annie Hirshfield, a witness for the State, on her cross-examination, that the witness had resided in the house of defendant for nine months past, and that, on the night of the homicide, five or ten minutes or about that time (it may have been less) after the last shot had been fired, witness went to defendant's ice factory, some seventy yards distant, and there found the defendant, who said, "I am sorry I was compelled to do what I have done; I was sleeping in the factory when I heard the noise of breaking dishes in the house. I got up and went towards my house and heard Burns say he would kill me, and he was coming towards me with what I thought was a gun in his hands, and saying, "I will kill him, the damned son of a bitch;" and I fired on him twice. I do not know whether I have killed him or not. I will go down to McDonald's with you, and then go to Belton and surrender myself to the sheriff." This he did.

It will be remembered that no person saw either of the parties at the time of the shooting. The question is presented, Is this explanation of defendant admissible? We think so, especially in view of the evidence of McDonald. The surrounding circumstances demanded an explanation. A failure to explain just when he did explain would, to our minds, have been an inculpatory fact; for, as before stated, the time, presence, in fact all the immediate surroundings, imperatively demanded an explanation. It is, however, objected that this explanation may have been manufactured. Suppose that it had been. Could the State complain? If the jury should believe it

manufactured, instead of being of benefit to defendant, it would have been a terrible fact against him. All of the authorities hold the suppression or manufacturing of evidence by defendant to be inculpatory facts. If the explanation was not self-serving but spontaneous, was not the defendant entitled to it? Who was in danger,— the State? Not by any means; for if, as above stated, the jury should believe them self-serving declarations, instead of being exculpatory they would become terrible weapons in the hands of the State to be used against the defendant. If, therefore, the defendant was willing to leave this question, to wit, whether spontaneous or manufactured, to the jury, certainly the State could not complain upon the ground that they *may have been* manufactured. Who was better prepared to pass upon this question than the jury? The writer alone is responsible for these observations, and not the court.

We think these declarations of the defendant was a part of the *res gestæ*, so called. The writer is not prepossessed in favor of this term, and therefore will state the proposition thus. The declarations or explanation of the defendant under the *circumstances in this case* were admissible because they tended evidently to explain the acts of the parties at the time of the killing; and therefore tended to explain the main act or fact, the killing.

We are of the opinion that the facts in this case demanded a charge on manslaughter, first, to complete the definition of murder in the second degree; second, because there was evidence tending to present that issue.

We feel it our duty, though a reversal must be had on other grounds, to express our disapprobation of the conduct of the court in relation to the matters contained in the fifth bill of exceptions. It appears by this bill that the court appointed J. M. Roseborough to assist the county attorney in the prosecution, and that in his argument to the jury he said: "I do not appear before you

as a hired counsel in this case, but I appear simply at the suggestion of the judge to assist in this prosecution, because the county attorney was worn out." The defendant objected to these remarks upon the ground that they tended to impress the jury with the belief that the judge presiding believed the defendant guilty and desired his conviction.

We are of the opinion that the defendant had just grounds to object that the remarks of the attorney, whether intended or not, were calculated to have that effect on the minds of the jury. The court, especially when the defendant objected, should have stopped the learned counsel, and should then and there, in a manner not to be doubted, have told the jury that the purpose of the appointment was not to be construed in any such light.

For the errors above indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*